## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEON MARTIN, Derivatively on Behalf of Nominal Defendant AMGEN INC., | ) ) ) |
| Plaintiff, | ) Case No. _____ ) |
| v. | ) JURY TRIAL DEMANDED ) |
| ROBERT A. BRADWAY, WANDA AUSTIN, MICHAEL DRAKE, BRIAN DRUKER, ROBERT ECKERT, GREG GARLAND, CHARLES HOLLEY JR., S. OMAR ISHRAK, TYLER JACKS, ELLEN KULLMAN, AMY E. MILES, RONALD SUGAR, R. SANDERS WILLIAMS, and PETER H. GRIFFITH, | ) ) ) ) ) ) ) ) ) ) |
| Defendants, | ) ) |
| and | ) ) |
| AMGEN INC., | ) ) |
| Nominal Defendant. | ) |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Leon Martin ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Amgen Inc. ("Amgen" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers for Defendants' (defined below) breaches of fiduciary duties, unjust enrichment, waste of corporate assets, and violations of Sections 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and

announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Amgen, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of Amgen against certain officers and members of the Company's Board (collectively, the "Individual Defendants") (defined further, *infra*) for, among other things, breaching their fiduciary duties to Company stockholders by intentionally or recklessly making or permitting the dissemination of materially false and misleading statements and omissions from July 29, 2020 through April 27, 2022 (the "Relevant Period") regarding the Company's tax liabilities, business and finances, and the adequacy and maintenance of its internal controls.

2.       Amgen is a biotechnology company with a presence in approximately 100 countries worldwide that develops and manufactures human therapeutics for patients suffering from serious illnesses. The Company maintains an internal manufacturing network to supply its commercial production capabilities for bulk drug manufacturing, formulation, and device assembly within the United States and its territory in Puerto Rico, as well as internationally. Amgen also operates distribution centers within the United States as well as in Puerto Rico and abroad.

3.      The Company has long claimed that it was properly taking advantage of substantial favorable tax benefits provided by its Puerto Rico operations, which was treated as a foreign jurisdiction for U.S. tax purposes, including a lower income tax, tax incentive grants available to Amgen through 2035, and undistributed foreign earnings for which no U.S. income taxes or foreign withholding taxes were provided because such earnings would purportedly be invested

indefinitely outside the United States.

4.     However, in early 2017, following an Internal Revenue Service ("IRS") audit, Amgen received Notices of Proposed Adjustment ("NOPAs") for tax years 2010, 2011, and 2012 related primarily to the allocation of profits between Amgen's U.S. and Puerto Rico facilities. On April 12, 2017, Amgen received a Revenue Agent's Report ("RAR") from the IRS for the years 2010, 2011, and 2012 that included the proposed adjustments, which was followed by receipt of a modified RAR in November 2017 for the same tax years. In April 2020, Amgen received NOPAs proposing similar profit allocation adjustments for tax years 2013, 2014, and 2015, which were followed by receipt of an RAR for these same tax years in May 2020.

5.     Rather than disclose these material adverse facts to investors and the public, the Company failed to take any meaningful accrual or otherwise reveal the staggering amount of back taxes and penalties claimed by the U.S. government. Additionally, Amgen's periodic financial filings failed to disclose known trends and uncertainties and the true risks arising out of the Company's receipt of the RARs and its failure to dissuade the IRS from its positions adverse to the Company.

6.     Following a series of partial disclosures, the full truth was finally revealed on April 27, 2022, when the Company disclosed that it had received a Notice of Deficiency from the IRS in April 2022 seeking more than $10 billion in back taxes and penalties as a result of Amgen's improper tax avoidance strategies.

7.     As set forth herein, the Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all

relevant times.

8.      Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

9.      As a result of the foregoing, a securities fraud class action has commenced against the Company, its Chief Executive Officer ("CEO") Robert A. Bradway ("Bradway"), and Chief Financial Officer Peter H. Griffith ("Griffith") captioned, *Roofers Local No. 149 Pension Fund v. Amgen Inc. et al,* Docket No. 1:23-cv-02138 (S.D.N.Y.) (the "Securities Action"). The Securities Action has exposed the Company to massive class-wide liability.

10.     In light of the Individual Defendant's misconduct—which has subjected the Company to the Securities Action, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend millions of dollars.

11.     Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Amgen's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

4

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of sections 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

13.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

15.    In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

16.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Nominal Defendant Amgen's stock trades on the NASDAQ Stock Market ("NASDAQ"), which is headquartered in New York, New York, and Amgen conducts business in this District.

## PARTIES

*Plaintiff*

17.    Plaintiff currently holds shares of Amgen common stock and has been a continuous holder at all relevant times.

*Nominal Defendant*

18.    Nominal Defendant Amgen is incorporated under the laws of Delaware with its principal executive offices located in Thousand Oaks, California. Amgen's common stock trades on the NASDAQ under the ticker symbol "AMGN."

*Individual Defendants*

19.     Defendant Bradway has served as CEO since May 2012 and as Chairman of the Board since January 2013. As set forth in the proxy statement filed by Amgen with the SEC on April 6, 2023 (the "2023 Proxy"), Bradway received $21,399,733 in compensation from the Company in 2022. Defendant Bradway is named as a defendant in the Securities Action.

20.     Defendant Wanda Austin ("Austin") has served as a member of the Board since 2017. Austin also serves as a member of the Board's Audit Committee and the Compensation and Management Development Committee (the "Compensation Committee"). According to the 2023 Proxy, Austin received $359,774 in compensation from the Company in 2022.

21.     Defendant Michael Drake ("Drake") has served as a member of the Board since August 2022. Drake also serves as a member of the Governance and Nominating Committee and the Corporate Responsibility and Compliance Committee (the "Compliance Committee"). According to the 2023 Proxy, Drake received $207,507 in compensation from the Company in 2022.

22.     Defendant Brian Druker ("Druker") has served as a member of the Board since 2018. Druker also serves as a member of the Compensation Committee and the Compliance Committee. According to the 2023 Proxy, Druker received $359,774 in compensation from the Company in 2022.

23.     Defendant Robert Eckert ("Eckert") serves as the Lead Independent Director of the Board and has served as a member of the Board since 2012. Eckert also serves as chair of the Compensation Committee and as a member of the Governance and Nominating Committee and the Executive Committee. According to the 2023 Proxy, Eckert received $419,774 in compensation from the Company in 2022.

24.     Defendant Greg Garland ("Garland") has served as a member of the Board since 2013. Garland also serves as chair of the Governance and Nominating Committee and as a member of the Executive Committee and the Compensation Committee. According to the 2023 Proxy, Garland received $379,774 in compensation from the Company in 2022.

25.     Defendant Charles Holley Jr. ("Holley") has served as a member of the Board since 2017. Holley also serves as Chair of the Audit Committee and as a member of the Governance and Nominating Committee and the Executive Committee. According to the 2023 Proxy, Holley received $369,774 in compensation from the Company in 2022.

26.     Defendant S. Omar Ishrak ("Ishrak") has served as a member of the Board since July 2021. Ishrak also serves as a member of the Compensation Committee and the Compliance Committee. According to the 2023 Proxy, Ishrak received $359,890 in compensation from the Company in 2022.

27.     Defendant Tyler Jacks ("Jacks") has served as a member of the Board since January 2012. Jacks also serves as a member of the Compensation Committee and the Compliance Committee. According to the 2023 Proxy, Jacks received $359,774 in compensation from the Company in 2022.

28.     Defendant Ellen Kullman ("Kullman") has served as a member of the Board since October 2016. Kullman also serves as a member of the Audit Committee and the Governance and Nominating Committee. According to the 2023 Proxy, Kullman received $359,912 in compensation from the Company in 2022.

29.     Defendant Amy E. Miles ("Miles") has served as a member of the Board since July 2020. Miles also serves as a member of the Audit Committee and the Governance and Nominating Committee. According to the 2023 Proxy, Miles received $359,813 in compensation from the

Company in 2022.

30.     Defendant Ronald Sugar ("Sugar") has served as a member of the Board since July 2010. Sugar also serves as chair of the Compliance Committee and as a member of the Executive Committee and the Governance and Nominating Committee. According to the 2023 Proxy, Sugar received $380,818 in compensation from the Company in 2022.

31.     Defendant R. Sanders Williams ("Williams") has served as a member of the Board since July 2020. Miles also serves as a member of the Audit Committee and the Governance and Nominating Committee. According to the 2023 Proxy, Williams received $359,938 in compensation from the Company in 2022.

32.     Defendant Griffith has served as the Company's CFO since January 2020. As set forth in the 2023 Proxy, Griffith received $7,073,735 in compensation from the Company in 2022. Defendant Griffith is named as a defendant in the Securities Action.

33.     Defendants referenced in paragraphs 19 through 32 are herein referred to as the "Individual Defendants."

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

34.     By reason of their positions as officers and/or directors of Amgen, and because of their ability to control the business and corporate affairs of Amgen, the Individual Defendants owed Amgen and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Amgen in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of Amgen and its shareholders so as to benefit all shareholders equally.

35.     Each director and officer of the Company owes to Amgen and its shareholders the

8

fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

36.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Amgen, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

37.    To discharge their duties, the officers and directors of Amgen were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

38.    Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Amgen, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

39.    As senior executive officer and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially

misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

40.   To discharge their duties, the officers and directors of Amgen were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Amgen were required to, among other things:

(a)   ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Amgen's own Staff Code of Conduct, Code of Ethics for CEO and Senior Financial Officers, and Board of Directors Code of Conduct (collectively, the "Codes of Conduct");

(b)   conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)   remain informed as to how Amgen conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)   establish and maintain systematic and accurate records and reports of the business and internal affairs of Amgen and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Amgen's operations would comply with all applicable laws and Amgen's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

41.      Each of the Individual Defendants further owed to Amgen and the shareholders the duty of loyalty requiring that each favor Amgen's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

42.      At all times relevant hereto, the Individual Defendants were the agents of each other and of Amgen and were at all times acting within the course and scope of such agency.

43.      Because of their advisory, executive, managerial, and directorial positions with Amgen, each of the Individual Defendants had access to adverse, non-public information about the Company.

44.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein,

11

as well as the contents of the various public statements issued by Amgen.

## AMGEN'S CODES OF CONDUCT AND ETHICS

45.     Amgen maintains a Code of Conduct applicable to all staff members, titled "Do the Right Thing." The Code of Conduct applies to "all staff and levels of management," as well as the CEO and all senior financial officers.

46.     The Code of Conduct contains a message from Defendant Bradway explaining that "[d]oing the right thing for the right reasons is the only way to earn and keep the confidence and trust of our partners, customers, the public, and patients we serve."

47.     The Code of Conduct requires all staff and senior financial officers to report violations of the Code of Conduct, stating, "[w]e all have a responsibility to protect our company from unethical behavior and policy violations. You are required to tell someone if you know of a problem or suspect something is wrong."

48.     The Company's "Board of Directors Corporate Governance Principles," as amended October 28, 2022, states that the Board shall "evaluate, no less than annually, the Company's compliance and reporting systems."

49.     The Company's "Code of Ethics for CEO and Senior Financial Officers" sets forth principles "designed to deter wrongdoing and ensure Amgen's CEO and Senior Financial Officers," including that such officers "conduct business in a highly ethical and responsible manner," and comply with "all applicable laws, rules and regulations."

50.     The Code of Ethics for CEO and Senior Financial Officers further states that all covered officers, which includes the CEO, CFO, principal accounting officer and all Vice Presidents and above in Finance worldwide, shall:

> ▪ Engage in and promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and

professional relationships;

▪ Produce, or cause to be produced, full, fair, accurate, timely, and understandable disclosure in reports and documents that Amgen files with, or submits to, the Securities and Exchange Commission and in other public communications made by Amgen;

▪ Comply with applicable governmental laws, rules and regulations;

▪ Promptly report violations of this policy as provided below; and

▪ Be held accountable for adherence to this policy.

### AMGEN'S AUDIT COMMITTEE CHARTER

51.     Amgen maintains an Audit Committee Charter, as amended October 21, 2020, which states the purpose of the Audit Committee is to, among other things, "oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company as required by the rules and regulations of [Nasdaq].". Additionally, the Audit Committee assists the Board "in fulfilling its fiduciary responsibilities with respect to the oversight of the Company's affairs in the areas of financial accounting and reporting, the underlying internal controls and procedures over financial reporting, and the audits of the financial statements of the Company."

52.     With respect to internal controls, the Audit Committee Charter states that the Audit Committee's responsibilities include:

6. Discussing at least annually with management, the internal auditors and the independent auditors the adequacy and effectiveness of the Company's internal controls over financial reporting, disclosure controls and procedures, the integrity of its financial reporting processes, and the adequacy of its financial risk management programs and policies and enterprise risk management issues relating thereto, including recommendations for any improvements in these areas.

*          *          *

9. Obtaining and reviewing, at least annually, a report from the independent auditors describing (i) the auditing firm's internal quality control procedures, and (ii) any material issues raised by the auditing firm's internal quality control reviews, by peer reviews of the firm, or by any governmental or other inquiry or

investigation relating to the audit of the Company. The Committee will also review steps taken by the auditing firm to address findings in any of the foregoing reviews.

*          *          *

14. Establishing procedures for the receipt, retention and treatment of complaints regarding accounting, internal accounting controls, or auditing matters, and the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters, as required by the rules and regulations of the SEC.

53.    With respect to financial review and disclosures, the Audit Committee Charter

states that the Audit Committee's responsibilities include:

10. Reviewing and discussing with management the Company's financial results, including a draft of the earnings press releases, prior to issuing the Company's quarterly and year-end earnings press releases.

*          *          *

12. Prior to the Company filing the Annual Report on Form 10-K (the "Form 10-K"), including the Management's Discussion and Analysis of Financial Condition and Results of Operation section, with the SEC:

A. Reviewing and discussing the Company's audited annual financial statements included in the Form 10-K with management and the independent auditors.

B. Discussing with the independent auditors the matters required to be discussed under the Public Company Accounting Oversight Board (the "PCAOB") Auditing Standard No. 1301, as modified or supplemented.

C. Discussing all relationships between the independent auditors and the Company, as disclosed in the written statement provided by the independent auditors in accordance with the requirements of PCAOB Rule 3526, as modified or supplemented, which may impact the independence of the independent auditors and taking, or recommending that the Board take appropriate action, if needed, to oversee the independence of the independent auditors.

D. Based on the results of the review and discussions in A, B, and C above, determining whether to recommend to the Board that such financial statements be included in the Form 10-K for filing with the SEC.

13. For the purposes of disclosure in the Company's proxy statement:

A. Providing a report from the Committee to be included in the Company's

proxy statement related to the performance of certain of the Committee's responsibilities, as required by the rules and regulations of the SEC.

B.   The Committee shall, if applicable, consider whether the independent auditors' provision of any permitted information technology services or other non-audit services to the Company is compatible with maintaining the independence of the independent auditors.

## SUBSTANTIVE ALLEGATIONS

### *Background*

54.   Founded in 1980, Amgen develops, manufactures, and delivers human therapeutics for patients suffering from serious illnesses, with a focus on areas of high unmet medical need. The Company has grown to become one of the largest biopharmaceutical companies in the world with a presence in approximately 100 countries worldwide. Amgen achieved over $26 billion in revenues for the most recent fiscal year, ended December 31, 2022, with over 70% of that revenue coming from product sales in the United States.

55.   Amgen manufactures both biologics and small molecule drugs, with commercial production capabilities for bulk manufacturing, formulation, fill, finish, tableting and device assembly within the United States, its territory in Puerto Rico, and internationally. The Company also operates distribution centers in the United States, as well as in Puerto Rico and the Netherlands, for worldwide distribution of the majority of its commercial and clinical products

56.   The Company has long claimed that it was properly taking advantage of substantial favorable tax benefits provided by its Puerto Rico operations, which was treated as a foreign jurisdiction for U.S. tax purposes, including a lower income tax, tax incentive grants available to the Company through 2035, and undistributed foreign earnings for which no U.S. income taxes or foreign withholding taxes were provided because such earnings would purportedly be invested indefinitely outside the United States.

57.     Accordingly, and in large part because of its reliance on the tax implications of its Puerto Rico operations, Amgen has historically claimed an extremely low effective tax rate. For instance, Amgen claimed an effective tax rate of just 3.5%, 7.6%, and 13% for its 2013, 2014, and 2015 fiscal years, respectively. An article posted on the investor forum *The Motley Fool*, titled "3 Drugmakers That Probably Have Lower Tax Rates Than You Do," explained that "Amgen generated one-fifth of its total revenue in 2015 outside the U.S. While it paid the standard U.S. corporate tax rate of 35% on the rest of its revenue, the biotech deliberately invested its international sales elsewhere rather than bring them into the U.S. Amgen also received some help due to an excise tax credit in Puerto Rico."

58.     In early 2017, following an IRS audit, Amgen received NOPAs for tax years 2010, 2011, and 2012. The proposed adjustments related primarily to the allocation of profits between Amgen's U.S. and Puerto Rico facilities.

59.     On April 12, 2017, Amgen received the RAR from the IRS for the years 2010, 2011, and 2012 that included the proposed adjustments, which was followed by receipt of a modified RAR in November 2017 for the same tax years. Similarly, in April 2020, Amgen received NOPAs proposing similar profit allocation adjustments for tax years 2013, 2014, and 2015, which were followed by receipt of an RAR for these same tax years in May 2020.

60.     Unbeknownst to investors, the various RARs stated that Amgen had improperly avoided U.S. tax laws for several years, was relying on a profit allocation system that ran afoul of the U.S. tax code, and was liable for billions of dollars in back taxes.

61.     Following receipt of the RARs, Amgen advocated behind the scenes for the IRS to change its position regarding the Company's tax accounting and to lower the Company's tax bill. Ultimately, Amgen exhausted internal IRS dispute mechanisms, making it substantially likely that

the Company would have to pay billions of dollars in back taxes and penalties.

62.     In accordance with Generally Accepted Accounting Principles ("GAAP"), Amgen was required to not only disclose the existence of the tax dispute, but also to provide investors with a reasonable estimate of the amount in dispute, to disclose the likely impact to other tax years which had been assessed using the same tax treatment and to disclose anticipated penalties (resulting in billions of dollars of additional liability), and to take appropriate accruals.

63.     The tax dispute represented a known loss contingency under GAAP, namely Accounting Standards Codification Topic 450, Contingencies ("ASC 450"). ASC 450 defines a loss contingency as "[a]n existing condition, situation, or set of circumstances involving uncertainty as to possible . . . loss . . . to an entity that will ultimately be resolved when one or more future events occur or fail to occur." Under ASC 450, loss contingencies include "actual or possible claims and assessments," and "pending or threatened litigation."

64.     ASC 450 requires that an estimated loss from a loss contingency shall be accrued by a charge to income if both of the following conditions are met: (i) information available before the financial statements are issued indicates that it is probable[1] that a liability had been incurred at the date of the financial statements; and (ii) the amount of loss can be reasonably estimated. ASC 450 further states that when no accrual is made, either because the loss is not "probable" or because the amount of loss cannot be "reasonably estimated," the loss contingency nonetheless must be disclosed if there is at least a reasonable possibility that a loss may have been incurred. ASC 450 defines "reasonably possible" as the chance of occurrence being "more than remote but less than likely." When disclosure is required under ASC 450, the issuer must include both the "nature of

---

[1] ASC 450 defines "probable" as "[t]he future event or events are likely to occur."

the contingency" and an "estimate of the possible loss or range of loss or a statement that such an estimate cannot be made."

65.     By the start of the Relevant Period, after years of failed attempts to avoid receiving notices of deficiency which would ultimately make the Company liable for over $10 billion in taxes and penalties, ASC 450 and other legal requirements compelled Amgen to make substantial disclosures regarding the Company's outstanding tax liabilities to investors. Instead, Defendants failed to take any meaningful accrual or otherwise reveal the staggering amount of back taxes and penalties claimed by the U.S. government.

66.     These materially omissions caused the price of Amgen stock to trade at artificially inflated prices throughout the Relevant Period, ultimately causing investors to suffer hundreds of millions of dollars in losses when the truth was revealed.

***Materially False and Misleading Statements***

67.     On July 29, 2020, at the start of the Relevant Period, Amgen filed its quarterly report on Form 10-Q for the period ended June 30, 2020 (the "2Q20 10-Q") with the SEC. The 2Q20 10-Q did not disclose any meaningful accrual for tax liabilities related to the RARs or Amgen's ongoing tax dispute with the U.S. government, and instead stated existing accruals were "appropriate." With respect to the RARs, the 2Q20 10-Q stated, in relevant part:

> As previously disclosed, we received an RAR from the IRS for the years 2010, 2011 and 2012. The RAR proposes to make significant adjustments that relate primarily to the allocation of profits between certain of our entities in the United States and the U.S. territory of Puerto Rico. In November 2017, we received a modified RAR that revised the IRS's calculations but continued to propose substantial adjustments. ***We disagree with the proposed adjustments and calculations and are pursuing resolution with the IRS administrative appeals office, which currently has jurisdiction over the matter. If we are unable to reach resolution, we will vigorously contest the proposed adjustments through the***

*judicial process*.[2] In addition, as previously reported, in April 2020, we received draft NOPAs and subsequently in May 2020, we received an RAR from the IRS for the years 2013, 2014 and 2015, which are similar to the proposed adjustments for the years 2010, 2011 and 2012 that relate primarily to the allocation of profits between certain of our entities in the United States and the U.S. territory of Puerto Rico. *We disagree with the proposed adjustments and calculations and will pursue resolution with the IRS administrative appeals office*. Final resolution of these complex matters is not likely within the next 12 months and could have a material impact on our condensed consolidated financial statements. *We believe our accrual for income tax liabilities is appropriate based on past experience, interpretations of tax law and judgments about potential actions by tax authorities*; however, due to the complexity of the provision for income taxes, the ultimate resolution of any tax matters may result in payments substantially greater or less than amounts accrued.

68.     On October 29, 2020, Amgen filed its quarterly report on Form 10-Q for the period ended September 30, 2020 (the "3Q20 10-Q") with the SEC. The 3Q20 10-Q did not disclose any meaningful accrual for tax liabilities related to the RARs or Amgen's ongoing tax dispute with the U.S. government, and instead stated existing accruals were "appropriate." The 3Q20 10-Q made substantially the same representations regarding the RARs provided in the 2Q20 10-Q. Additionally, the 3Q20 10-Q stated that, in September 2020, Amgen had "received a revised RAR that continues to propose substantial adjustments for the years 2013, 2014 and 2015," but that Amgen "disagree[d] with the proposed adjustments and calculations and will pursue resolution with the IRS administrative appeals office."

69.     On February 9, 2021, Amgen filed its annual report on Form 10-K for the period ended December 31, 2020 (the "2020 10-K") with the SEC. The 2020 10-K did not disclose any meaningful accrual for tax liabilities related to the RARs or Amgen's ongoing tax dispute with the U.S. government, and instead stated existing accruals were "appropriate." The 2020 10-K made substantially the same representations regarding the RARs provided in the 3Q20 10-Q.

---

[2] All emphases added unless otherwise indicated.

Additionally, the 2020 10-K stated that Amgen had "been unable to reach resolution at the administrative appeals level, and we anticipate that we will receive a Notice of Deficiency which we would expect to vigorously contest through the judicial process."

70.     On April 28, 2021, Amgen filed its quarterly report on Form 10-Q for the period ended March 31, 2021 (the "1Q21 10-Q") with the SEC. The 1Q21 10-Q did not disclose any meaningful accrual for tax liabilities related to the RARs or Amgen's ongoing tax dispute with the U.S. government, and instead stated existing accruals were "appropriate." Further, the 1Q21 10-Q made substantially the same representations regarding the RARs provided in the 2020 10-K.

71.     The statements detailed above were materially false and misleading and failed to disclose the following adverse facts, including: (i) that the U.S. government claimed Amgen owed more than $3 billion in back taxes for tax years 2010, 2011, and 2012; (ii) that the U.S. government claimed Amgen owed more than $5 billion in back taxes for tax years 2013, 2014, and 2015; (iii) that the U.S. government would likely claim Amgen owed materially more to the U.S. government than investors had been led to believe for subsequent tax years for which the Company had used the same profit allocation treatment between its U.S. and Puerto Rico operations; (iv) that Amgen had not taken sufficient accruals to account for its outstanding tax liabilities; (v) that Amgen had failed to comply with ASC 450 and other rules and regulations regarding the preparation of its periodic SEC filings; and (vi) that Amgen's refusal to pay taxes claimed by the U.S. government exposed the Company to a substantial risk of severe financial penalties imposed by the IRS.

***The Truth Begins to Emerge***

72.     The truth began to emerge on August 3, 2021, when Amgen issued an earnings release for its second fiscal quarter of 2021 disclosing, for the first time, the massive outstanding tax liabilities sought by the IRS. The earnings release stated that Amgen had received a Notice of

Deficiency from the IRS in July 2021 which sought $3.6 billion in back taxes, plus interest, for tax years 2010, 2011, and 2012. The earnings release added that Amgen had filed a petition in the U.S. Tax Court to contest the Notice of Deficiency.

73.     On the same day, Amgen hosted a quarterly earnings call with analysts and investors. During the call, Defendant Griffith downplayed the extent of the Company's tax liabilities. When asked by an analyst whether similar Notices of Deficiency were likely for subsequent tax years, Defendant Griffith responded by stating that "the IRS' position is without merit" and that Amgen had "appropriate tax reserves."

74.     Defendant Griffith also defended the Company's position by pointing to the scope of its Puerto Rico operations, stating, in relevant part:

> And on your question around the IRS matter, the dispute, look, these notices are related to a transfer pricing dispute with the IRS regarding the allocation of the profits between the U.S. and the territory of Puerto Rico. ***So you can see we have a difference of opinion on the value of the significant risks and the complexity we undertake with activities performed at our Puerto Rico facility. We strongly believe the IRS' position is without merit, and we have appropriate tax reserves, and this dispute will take several years to resolve.***
>
> ***I would like to note, Salim, that Puerto Rico is our flagship manufacturing facility, responsible for the majority of Amgen's global manufacturing.*** We're proud of our Puerto Rico operations, very proud of them and our colleagues there. We've had a major manufacturing presence in Puerto Rico for about 30 years. We have more than 2,200 highly skilled colleagues in Puerto Rico and who produce very sophisticated biologic medicines for patients all over the world with serious diseases. We've invested nearly $4 billion to expand and modernize those facilities in Puerto Rico, and we're proud to be consistently recognized as one of the island's best and most responsible employers.

75.     On the same August 3, 2021 earnings call, Defendant Griffith again claimed that Amgen had "adequate reserves" for ongoing audits relating to tax years 2016 through 2018, even though the IRS was likely to take similar positions with respect to those years.

76.     On August 4, 2021, Amgen filed its quarterly report on Form 10-Q for the period

ended June 30, 2021 (the "2Q21 10-Q") with the SEC. The 2Q21 10-Q did not disclose any

meaningful accrual for tax liabilities related to the RARs or Amgen's ongoing tax dispute with the

U.S. government, and instead stated existing accruals were "appropriate." With respect to the

RARs, the 2Q21 10-Q stated, in relevant part:

> In 2017, we received a Revenue Agent Report (RAR) and a modified RAR from
> the Internal Revenue Service (IRS) for the years 2010, 2011 and 2012 proposing
> significant adjustments that primarily relate to the allocation of profits between
> certain of our entities in the United States and the U.S. territory of Puerto Rico. We
> disagreed with the proposed adjustments and calculations and pursued a resolution
> with the IRS administrative appeals office. As previously reported, we were unable
> to reach resolution with the IRS appeals office. In July 2021, we filed a petition in
> the U.S. Tax Court to contest two duplicate Statutory Notices of Deficiency
> (Notices) for 2010, 2011 and 2012 that we received in May and July 2021. The
> duplicate Notices seek to increase our U.S. taxable income by an amount that would
> result in additional federal tax of approximately $3.6 billion, plus interest. ***Any***
> ***additional tax that could be imposed would be reduced by up to approximately***
> ***$900 million of repatriation tax previously accrued on our foreign earnings. In***
> ***any event, we firmly believe that the IRS's positions in the Notices are without***
> ***merit and we will vigorously contest the Notices through the judicial process***.

> In addition, in 2020, we received an RAR and a modified RAR from the IRS for
> the years 2013, 2014 and 2015 also proposing significant adjustments that primarily
> relate to the allocation of profits between certain of our entities in the United States
> and the U.S. territory of Puerto Rico, similar to those proposed for the years 2010,
> 2011 and 2012. ***We disagree with the proposed adjustments and calculations and***
> ***are pursuing resolution with the IRS administrative appeals office***. We are
> currently under examination by the IRS for the years 2016, 2017 and 2018.

77.     In response to this news, the price of Amgen common stock closed down 6.5%, or

$15.77 per share, on August 4, 2021.

78.     On November 2, 2021, Amgen filed its quarterly report on Form 10-Q for the period

ended September 30, 2021 (the "3Q21 10-Q") with the SEC. The 3Q21 10-Q did not disclose any

meaningful accrual for tax liabilities related to the RARs or Amgen's ongoing tax dispute with the

U.S. government, and instead stated existing accruals were "appropriate." In addition to making

substantially the same representations regarding the RARs provided in the 2Q21 10-Q, the 3Q21

10-Q added:

> As a consequence of the Tax Court litigation for the 2010-2012 period, the IRS administrative appeals office recently informed us that it does not plan to engage in discussions at this time regarding the allocation of profits between our entities in the United States and the U.S. territory of Puerto Rico for the 2013-2015 period.

79.     On February 16, 2022, Amgen filed its annual report on Form 10-K for the period ended December 31, 2021 (the "2021 10-K") with the SEC. The 2021 10-K did not disclose any meaningful accrual for tax liabilities related to the RARs or Amgen's ongoing tax dispute with the U.S. government, and instead stated existing accruals were "appropriate." In addition to making substantially the same representations regarding the RARs provided in the 3Q21 10-Q, the 2021 10-K added that Amgen had been "unable to reach resolution at the administrative appeals level," and "anticipate[d] that [it] will receive a statutory notice of deficiency for these years as well."

80.     The statements detailed above were materially false and misleading and failed to disclose the following adverse facts, including: (i) that the U.S. government claimed Amgen owed more than $5 billion in back taxes for tax years 2013, 2014, and 2015; (ii) that the U.S. government would likely claim Amgen owed materially more to the U.S. government than investors had been led to believe for subsequent tax years for which the Company had used the same profit allocation treatment between its U.S. and Puerto Rico operations; (iii) that Amgen had not taken sufficient accruals to account for its outstanding tax liabilities; (iv) that Amgen had failed to comply with ASC 450 and other rules and regulations regarding the preparation of its periodic SEC filings; and (v) that Amgen's refusal to pay taxes claimed by the U.S. government exposed the Company to a substantial risk of severe financial penalties imposed by the IRS.

81.     Additionally, though Amgen was required to disclose the adverse facts and circumstances detailed above under applicable SEC rules and regulations, the Company's filings with the SEC during the Relevant Period failed to make such disclosures. For instance, Item 303

of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303"), required the Company to disclose "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Item 105 of Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), meanwhile, required disclosure of "the material factors that ma[d]e an investment in [Amgen common stock] speculative or risky" and an explanation of "how [the] risk affect[ed] [Amgen]." The filings detailed above failed to disclose known trends and uncertainties and the true risks arising out of the Company's receipt of the RARs and failure to dissuade the IRS from its positions adverse to the Company in violation of Item 303 and Item 105. In fact, the purported risk disclosures provided in Amgen's periodic financial filings were themselves materially misleading because they created the false and misleading impression that Amgen's outstanding tax liabilities were far lower than in fact was the case.

82.     The full truth emerged on April 27, 2022, when Amgen issued an earnings release for its first fiscal quarter of 2022 disclosing that the Company had received a Notice of Deficiency from the IRS in April 2022 which sought $5.1 billion in back taxes, plus interest, for tax years 2013, 2014, and 2015, and proposed a $2 billion penalty as a result of Amgen's improper tax avoidance strategies. In sum, the collective amount that the IRS claimed was owed by the Company to the U.S. government totaled more than $10 billion, with likely additional back taxes owed for subsequent tax years for which Amgen had applied the same profit allocation treatment between its U.S. and Puerto Rico operations. The press release added that Amgen intended to file a petition in the U.S. Tax Court to contest the Notice of Deficiency, which it would seek to consolidate with its pending petition for earlier tax years.

83.     On this news, the price of Amgen common stock closed down 4.3%, or $10.66 per

share, on April 28, 2022. The price of Amgen's common stock continued to decline, reaching a low of $227.32 per share on May 2, 2022, or 8.6% below the closing price on April 27, 2022.

84.     Amgen has also disclosed that it is under examination by the IRS for the years 2016 to 2018 for similar issues as the prior Notices of Deficiency for years 2010 to 2015, as well as examination by various state and foreign tax jurisdictions. The Company has admitted that "the ultimate outcome of any tax matters may result in payments substantially greater than amounts accrued and could have a material adverse effect on the results of our operations."

***Harm to the Company***

85.     As a direct and proximate result of the Individual Defendants' misconduct, Amgen has lost and expended, and will lose and expend, millions of dollars.

86.     Such expenditures include, but are not limited to, legal fees associated with the Securities Action filed against the Company and its CEO and CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

87.     Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the material weaknesses in the Company's internal control over financial reporting.

88.     Such losses also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

89.     As a direct and proximate result of the Individual Defendants' conduct, Amgen has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and

the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

90.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

91.     Amgen is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

92.     Plaintiff is an owner of Amgen common stock and has been a continuous shareholder of Company stock at all relevant times.

93.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

94.     A pre-suit demand on the Board of Amgen is futile and, therefore, excused. At the time this action was commenced, the Board consisted of Defendants Bradway, Austin, Drake, Druker, Eckert, Garland, Holley, Ishrak, Jacks, Kullman, Miles, Sugar, and Williams (the "Director Defendants"). Plaintiff is only required to show that seven of the thirteen Director Defendants cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all thirteen Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

95.     Defendant Bradway provided signed certification that each of the Quarterly

Reports[3] were materially accurate, complete, and free from fraud. Furthermore, Defendants Bradway, Austin, Druker, Eckert, Garland, Holley, Jacks, Kullman, Miles, Sugar, and Williams signed the 2020 10-K, while Defendant Bradway provided signed certification that the 2020 10-K was materially accurate, complete, and free from fraud. Likewise, Defendants Bradway, Austin, Druker, Eckert, Garland, Holley, Ishrak, Jacks, Kullman, Miles, Sugar, and Williams signed the 2021 10-K, while Defendant Bradway provided signed certification that the 2021 10-K was materially accurate, complete, and free from fraud.

96.     In addition, Defendant Bradway has been named as a defendant in the Securities Action and, therefore, faces a substantial likelihood of liability for issuing and/or authorizing the issuance of the same materially false and misleading statements at issue in this action. Defendant Bradway, therefore, cannot exercise independent business judgment regarding allegations that arise from the same misconduct alleged here and in the Securities Action. Thus, any demand upon Bradway would be futile.

97.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

98.     The Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

99.     Additionally, the Director Defendants received payments, benefits, stock options,

---

[3] The "Quarterly Reports" include the 2Q20 10-Q, 3Q20 10-Q, 1Q21 10-Q, 2Q21 10-Q, and 3Q21 10-Q.

and other emoluments by virtue of their membership on the Board and their control of the Company.

100.     Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

101.     Defendants Holley, Austin, Killman, and Miles serve on the Company's Audit Committee (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, and the audits of the financial statements. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

102.     The Director Defendants, as members of the Board, were and are subject to the Company's Codes of Conduct. The Codes of Conduct go well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Directors violated the Codes of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants

violated the Codes of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

103.    Moreover, the Director Defendants have taken no remedial action to redress the conduct alleged herein.

## COUNT I

### Against The Individual Defendants For Violations of § 10(b)
### of the Exchange Act and Rule 10b-5

104.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

105.    The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

106.    The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

107.    The Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

108.    The Individual Defendants acted with scienter because they (i) knew that the public

documents and statements issued or disseminated in the name of Amgen were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

109.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Amgen, their control over, and/or receipt and/or modification of Amgen's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Amgen, participated in the fraudulent scheme alleged herein.

110.    As a result of the foregoing, the market price of Amgen common stock was artificially inflated. In ignorance of the falsity of the statements, stockholders relied on the statements described above and/or the integrity of the market price of Amgen common stock in purchasing Amgen common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

111.    Likewise, as a result of the wrongful conduct alleged herein, the Company has also suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Action and reputational harm.  The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Action.

## COUNT II

### Against The Individual Defendants
### For Breach Of Fiduciary Duty

112.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

113.    The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, candor, loyalty, and due care.

114.    The Individual Defendants willfully ignored the obvious deficiencies in the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

115.    The Individual Defendants breached their fiduciary duties of good faith, candor, loyalty, and due care by making and/or authorizing false and misleading statements concerning the Company's business, finances, and the adequacy of its internal controls.

116.    During the Relevant Period, the Individual Defendants intentionally or recklessly made or permitted materially false and misleading statements and omitted material facts concerning the Company's tax obligations, accruals for outstanding tax liabilities, compliance with ASC 450 and other rules and regulations regarding the preparation of Amgen's periodic SEC filings, and exposure to substantial risk of severe financial penalties imposed by the IRS.

117.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

118.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

119.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

120.    Plaintiff, on behalf of Amgen, has no adequate remedy at law.

## COUNT III

### Against The Individual Defendants for Aiding and
### Abetting Breach of Fiduciary Duty

121.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

122.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

123.    Plaintiff on behalf of Amgen has no adequate remedy at law.

## COUNT IV

### Against The Individual Defendants for Unjust Enrichment

124.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

125.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Amgen.

126.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Amgen that was tied to the performance or artificially inflated valuation of Amgen or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

127.    Plaintiff, as a stockholder and a representative of Amgen, seeks restitution from the

Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

128.    Plaintiff on behalf of Amgen has no adequate remedy at law.

## COUNT V

### Against The Individual Defendants For Waste Of Corporate Assets

129.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

130.    The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of the Company's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

131.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (a) paying and collecting excessive compensation and bonuses; and (b) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Action.

132.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

133.    Plaintiff on behalf Amgen has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Amgen and

that Plaintiff is a proper and adequate representative of the Company;

B.      Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment;

C.      Directing Amgen to take all necessary actions to reform and improve its corporate governance and internal procedures to protect Amgen and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- strengthening the Company's internal reporting and financial disclosure controls;

- developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and

- strengthening the Company's internal operational control functions;

C.      Awarding punitive damages;

D.      Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: August 2, 2023

**RIGRODSKY LAW, P.A.**

By:   */s/ Timothy J. MacFall*
Seth D. Rigrodsky
Timothy J. MacFall
Of Counsel:                                          Gina M. Serra
Vincent A. Licata
Joshua H. Grabar                                 825 East Gate Boulevard, Suite 300
**GRABAR LAW OFFICES**                Garden City, NY 11530
One Liberty Place                               Telephone: (516) 683-3516
1650 Market Street, Suite 3600        Email: sdr@rl-legal.com
Philadelphia, PA 19103                     Email: tjm@rl-legal.com
Telephone: (267) 507-6085               Email: gms@rl-legal.com
Email: jgrabar@grabarlaw.com         Email: vl@rl-legal.com

*Attorneys for Plaintiff*